UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| KAREN JO YOUNG,<br><br>    Plaintiff,<br><br>     v.<br><br>MAINE COAST REGIONAL HEALTH<br>FACILITIES d/b/a MAINE COAST<br>MEMORIAL HOSPITAL d/b/a NORTHERN<br>LIGHT MAINE COAST HOSPITAL and<br>EASTERN MAINE HEALTHCARE<br>SYSTEMS d/b/a NORTHERN LIGHT<br>HEALTH,<br><br>    Defendants. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Karen Jo Young ("Ms. Young"), by and through undersigned counsel, and complains against the Defendants, Maine Coast Regional Health Facilities d/b/a Maine Coast Memorial Hospital d/b/a Northern Light Maine Coast Hospital ("MCMH" or "Maine Coast") and Eastern Maine Healthcare Systems d/b/a Northern Light Health ("EMHS"), as follows:

JURISDICTION AND PARTIES

1.       This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.,* the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§ 831 et seq., as enforced through the MHRA; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; and the Rehabilitation Act ("Rehab Act"), 29 U.S.C. §§ 701 *et seq.*

2.       Ms. Young is a United States citizen residing in the Village of Corea, Town of Gouldsboro, County of Hancock, State of Maine.

3.      MCMH is a Maine non-profit corporation with a principal place of business in the City of Ellsworth, County of Hancock, State of Maine.

4.      EMHS is a Maine non-profit corporation with a principal place of business in the City of Brewer, County of Penobscot, State of Maine.

5.      At all material times, Defendants were an integrated enterprise.  Namely, Defendants had an interrelation of operations, common management, and centralized control of labor relations.

6.      MCMH and EMHS each had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

7.      At all relevant times, MCMH and EMHS were each recipients of federal financial assistance, i.e., Medicare and Medicaid.

8.      This Court has subject matter jurisdiction over Ms. Young's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

9.      On or about November 22, 2017, Ms. Young filed a timely Complaint/Charge of Discrimination against MCMH alleging disability discrimination, retaliation, and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

10.     On about April 6, 2018, Ms. Young filed an Amended Complaint/Charge of Discrimination with the MHRC and EEOC, adding EMHS as an additional Respondent.

11.     On or about April 12, 2019, the MHRC issued a Notice of Right to Sue with respect to Ms. Young's state law claims.

12.     On or about April 22, 2019 the EEOC issued Notices of Right to Sue with respect to Ms. Young's federal law claims.

13.     Ms. Young has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL REQUESTED

14.     Ms. Young requests a trial by jury for all claims and issues for which a jury is permitted.

## FACTUAL ALLEGATIONS

15.     MCMH is a 64-bed, full-service hospital serving Hancock and western Washington Counties.

16.     MCMH became a member of EMHS in 2015.

17.     EMHS is an integrated health delivery system with nine acute-care, medical-surgical hospitals, a freestanding psychiatric hospital, primary and specialty care physician practices, long-term care and home health and hospice, and ground and air emergency transport services.

18.     The names, job titles, and employer of individuals mentioned in this Complaint include:

    a.  Noah Lundy, Regional HR Director, EMHS;
    b.  Kelley Ann Columber, Communications Director, EMHS;
    c.  Doug Keith, Rehab Services Manager, MCMH;
    d.  John Ronan, President of MCMH and Blue Hill hospitals, EMHS;
    e.  Debbie Ehrlenbach, former Board Chairman;
    f.  Megan Randlett, Esq., EMHS;
    g.  Paul Bolin, VP and Chief Human Resources Officer, EMHS;
    h.  Suzanne Spruce, Chief Communications Officer, EMHS;
    i.  Glenn Martin, Esq., Vice President and General Counsel, EMHS;
    j.  Kathy Smith, HR Coordinator, MCMH;
    k.  Kim Formby, Occupational Therapy Clinical Supervisor, MCMH.

19.     Ms. Young was hired by MCMH in March 2004.

20.     As of 2017, Ms. Young was employed as the Swing Bed Activities Coordinator, also referred to as Swing Bed Activities Director.

21.    The Swing Bed program serves patients who receive rehabilitation and skilled nursing care.

22.    At the time that Ms. Young was fired in September 2017, her hourly rate of pay was $15.187 and she worked 28 hours per week.

23.    Ms. Young has a disability, spasmodic dysphonia, which is a severe speech impairment. Her condition constitutes a substantial limitation on the major life activity of speaking. Ms. Young's voice is soft and hoarse and is easily fatigued. It requires great effort for Ms. Young to speak.

24.    Ms. Young's condition also substantially impairs her physical health.

25.    Defendants also regarded Ms. Young as a person with a disability and as a person with a physical impairment.

26.    Between the time she was hired in March 2004 and the time she was fired in September 2017, Ms. Young requested and needed reasonable accommodations for her disability.

27.    Accommodations that MCMH granted included a portable voice amplifier, a white board, and prepared documents.

28.    Accommodations provided by MCMH did not allow Ms. Young to communicate effectively with patients who could not hear well, could not see well, or could not read.

29.    Ms. Young requested the use of volunteers to help her communicate effectively with all of her patients, including those who could not hear well, could not see well, or could not read.  MCMH denied these requests.

30.     During her employment Ms. Young complained that MCMH violated her right to confidentiality with regard to information about her disability and that MCMH did not safeguard confidential personnel records for other employees and some incidental patient information.

31.     MCMH threatened Ms. Young's job when Ms. Young engaged in protected activity, that is, when she complained about MCMH violating her right to medical confidentiality and the right to confidentiality of other employees and patients.

32.     On about June 24, 2016, Ms. Young filed a complaint of disability discrimination, retaliation and whistleblower retaliation with the MHRC.

33.     Ms. Young's complaint was dual-filed with the EEOC.

34.     In about June or July 2017, Ms. Young wrote an email to HR Director Lundy with a copy to Rehab Services Manager Keith and Kim Formby about concerns she had that patients' safety was at risk. One of the points she made in the email was that if she was able to use volunteers for patient activities, she would be more available to help with unsafe situations that arose on the med/surg unit.

35.     The MHRC issued an Investigator's Report on August 21, 2017 recommending "no reasonable grounds" to believe that MCMH's actions were unlawful.

36.     Ms. Young submitted her written disagreements with the recommendation of the Investigator's Report in a timely manner.

37.     Ms. Young attended the MHRC Commission meeting and made a presentation of her disagreements on September 18, 2017. Mr. Lundy attended the meeting on behalf of MCMH with the assistance of counsel (attorney Frank McGuire).

38.     The MHRC Commissioners voted to uphold the recommendations of the investigator.

39.     A few days later, *The Ellsworth American* published a letter to the editor that Ms. Young wrote about "unrest at MCMH." The publication date was September 21, 2017 but the newspaper was sold in stores on the afternoon of September 20, 2017.

40.     Ms. Young wrote the letter before the MHRC Commission meeting on September 18, 2017. Her final copy of the letter was emailed to *The Ellsworth American* on September 19, 2017.

41.     In her letter to the editor, Ms. Young expressed concerns about pay and working conditions at MCMH for doctors, nurses and other staff and for the quality of care that it was providing to its patients.

42.     Ms. Young made common cause with other employees who were voicing concerns over working conditions.

43.     Ms. Young's letter was one of several items published in *The Ellsworth American* at about the same time:

   a.   On August 31, 2017, an article appeared in the paper that quoted two providers connected with MCMH. Dr. W was quoted as saying that the hospital administrators "don't understand the value of good people" and that he left "out of disgust" after being asked to change the way he ran his practice. Dr. B was quoted as saying that medical staff were leaving and "heading for places where they can get better hours and pay." The article also quoted John Ronan, the President of MCMH, as well as (now former) Board Chairwoman Debbie Ehrlenbach, both of whom defended the merger with EMHS and the quality of care provided to patients.

   b.   On September 7, 2017, an article appeared in the paper that quoted two nurses (Mr. B and Ms. A) and a nurse anesthetist (Mr. D). Mr. B and Ms. A expressed concerns about understaffing. Ms. A was quoted as saying that staffing problems were hurting the hospital's ability to handle patients: "It seems like shortsighted financial decisions for a quick impact, but it's having long-term, devastating results." Mr. D was quoted as saying that three out of six nurse anesthetists had left their jobs and that a fourth was considering leaving due to the working conditions. Mr. D and Ms. B were quoted as saying that earlier that summer, there was no nurse anesthetist on call for an entire weekend and that as a result the operating room had to shut down.

    c.   On September 14, 2017, *The Ellsworth American* published a letter to the editor written by Dr. L who wrote that he "strongly agree[d] with the comments made by [his] colleagues [Drs. W and B] regarding "doctor dissatisfaction."

    d.   Ms. Young's letter to the editor appeared about five days after that.  The paper went on sale on the afternoon of September 20, 2017 with a publication date of September 21, 2017.

44.    MCMH recognized that Ms. Young's expressed dissatisfaction with how MCMH was being operated was similar to the facts and opinions expressed by other employees and providers.

45.    For example, on September 20, 2017, after Ms. Young's letter to the editor appeared in print, Ms. Columber wrote an email to MCMH and EMHS administrators stating, in part, "Another very unfavorable opinion letter was printed in today's paper." Mr. Lundy replied, "Karen Jo Young apparently penned the attached editorial in the EA… Interesting."

46.    On the morning of September 21, 2017, Mr. Lundy forwarded Ms. Columber's email and Ms. Young's letter to the editor to Mr. Bolin and attorney Megan Randlett.

47.    Mr. Bolin responded by saying, "I haven't read, but if there are new allegations, we need to investigate them."

48.    Ms. Randlett replied, "No, it's actually not about her alleged discrimination at all. More general musing about how terrible MCHC is … [emphasis added]."

49.    Mr. Lundy replied, "Right. I'm wondering what the remedy of the media policy is below…What type of action is warranted by her doing this?"

50.    Next, Mr. Lundy consulted with Ms. Young's supervisor, Mr. Keith.

51.    No information was provided by Defendants to the MHRC about the information exchanged between Mr. Lundy and Mr. Keith.

52.     Later that morning, President Ronan met with Mr. Bolin and Mr. Martin and they discussed Ms. Young's letter and EMHS's media policy.

53.     No information was provided by Defendants to the MHRC about the information exchanged between Mr. Lundy and Mr. Keith about Ms. Young.

54.     Following this discussion, Mr. Ronan decided that Ms. Young should be fired subject to further communications with EMHS's legal and human resources departments.

55.     No information was provided by Defendants to the MHRC about why Mr. Ronan decided that Ms. Young should be fired and not the other employees who were talking and writing about MCMH to the press.

56.     Mr. Ronan stated that he consulted with Ms. Randlett (Legal Department) and with Mr. Bolin (Human Resources) before he approved Ms. Young's termination.

57.     MCMH submitted a statement to the MHRC signed by Mr. Ronan in which he admits that he knew that Ms. Young had filed a complaint with the MHRC in 2016.

58.      In the early afternoon of September 21, 2017, Ms. Young was asked to meet with Mr. Lundy, Mr. Keith, and HR Coordinator Smith.

59.     Mr. Lundy told Ms. Young that it had come to their attention that she had issued a "news release" to *The Ellsworth American* in direct violation of policy and that she was being terminated effective immediately.

60.     Ms. Young asked for a copy of the policy. They refused to give the policy to her.

61.     Ms. Young told Mr. Lundy, Mr. Keith and Ms. Smith that she wrote a letter to the editor, not a "news release."

62.     Mr. Lundy repeated that Ms. Young had violated the policy.

63.     Ms. Young was handed a termination letter, signed by Mr. Lundy, which read:

 "This is to inform you that your employment is being terminated effective immediately for violation of EMHS Policy: News Release, External Publication and Media [hereinafter, the "Media Policy"] and in accordance with MCMH Memorial Hospital (MCMH) progressive disciplinary policy."

64.     After Ms. Young was fired, she obtained a copy of her personnel file which contained a document purporting to reflect statements made by her and Mr. Lundy during the termination meeting. The document is not accurate. For example, Ms. Young did not tell Mr. Lundy, Mr. Keith and Ms. Smith that she was going to notify the newspaper,[1] and Mr. Lundy did not say that he would mail a copy of the Media Policy to her.[2] Ms. Young did tell Mr. Lundy that she thought her termination was in retaliation for her complaint to the MHRC and EEOC, but that may have occurred as he was escorting her out.

65.     MCMH provided a statement to the MHRC signed by Suzanne Spruce, Chief Communications Officer for EMHS, discussing the business purpose of the Media Policy and the importance of protecting its "brand."

66.     Most patients' perception of the care they receive is based on their interactions with the doctors, nurses, therapists and the staff in the doctor offices. The administration decided to change the doctors' contracts resulting in several doctors leaving. This was in the news prior to Ms. Young's letter to the editor. The administration did not act on the nurses' concerns of inadequate staffing and the consequent risk to patient safety. This also was in the news before Ms. Young's letter was published.

---

[1] It did not occur to Ms. Young to call the newspaper until the meeting was over and she was in her car about to head home.

[2] Mr. Lundy did not mail a copy of the Media Policy to Ms. Young. MCMH also refused to give a reporter for *The Ellsworth American* a copy of the Media Policy. The reporter was able to obtain a copy from Mercy Hospital, which is also part of EMHS.

67.     As Ms. Young stated in her letter to the editor, MCMH staff were assured that their local board members would have a say in future decisions made by the conglomerate EMHS. She quoted previous board members who made similar assurances back when it was announced that MCMH was going to join with EMHS.

68.     Ms. Young's letter to the editor said little to impact the hospital's brand.

69.     EMHS had already negatively affected its own brand with its decisions about doctors' contracts and nursing staffing levels.

70.     Ms. Young does not recall ever having seen the Media Policy while she was employed by MCMH.

71.     MCMH has no evidence that Ms. Young was ever told about the Media Policy, shown the Media Policy, or read the Media Policy.

72.     There is no proof that the Media Policy was available through MCMH's policy portal in September 2016.

73.     MCMH maintains a record of the policies that employees are trained on.

74.     MCMH's records show that Ms. Young was not trained on the Media Policy.

75.     Even if Ms. Young had read the Media Policy prior to writing her letter to the editor, the policy was illegal because it prohibited employees from contacting or releasing any information about EHMS, member organizations or subsidiaries, to the media without the direct involvement of EHMS Community Relations Department or of the Chief Operating Officer responsible for that organization without exception.

76.     The Media Policy is unlawful because it prohibits employees from engaging in protected activity under the MHRA, ADA, the Rehab Act, the WPA, and other state and federal statutes that protect employees for making reports to public bodies about unfair and illegal

conditions at work. For example, the Media Policy is unlawful because it prohibits employees from making an oral or written report to a public body about unsafe or illegal conditions at work, which is protected by the WPA.

77.     The fact that Defendants maintained a policy which prohibited whistleblowing activity evidences retaliatory motive and animus on the part of the Defendants.

78.     The Media Policy also violated the National Labor Relations Act ("NLRA").

79.     After she was fired, Ms. Young filed a charge against MCMH with the National Labor Relations Board ("NLRB") alleging that MCMH terminated her employment because she engaged in protected concerted and union activity by submitting a letter to a local newspaper in which she made common cause with employees voicing concerns about working conditions, and that the Media Policy unlawfully restricted employees' work-related communications with the media.

80.     On November 2, 2018, Administrative Law Judge Paul Bogas issued a decision and recommended order in favor of Ms. Young.

81.     MCMH filed exceptions to Judge Bogas's decision and recommended order. The matter is still pending before the NLRB.

82.     At the time Defendants fired Ms. Young, they knew that many, if not most, of their employees were not aware of the Media Policy.

83.     On September 20, 2017, Ms. Columber sent an email to all MCMH Department Heads about the Media Policy. Ms. Columber wrote, in part, "I realize that some of you may have never seen this policy…"

84.     MCMH admitted to the MHRC that the only question it asked Ms. Young before she was fired was whether or not she wrote the letter to the editor that was published in *The*

*Ellsworth American* on September 20, 2017 and that because Ms. Young admitted that she wrote the letter, she was fired.

85.     Upon information and belief, MCMH deviated from the way it normally disciplines employees who violate its policies.

86.     MCMH has a progressive discipline policy.

87.     MCMH's policy and practice is to warn employees that their conduct violates a policy and then educate or retrain so that they may avoid non-compliance going forward.

88.     Ms. Young had no reason to believe that her letter to the editor violated any policy or that she would be fired for writing it.

89.     Reprimands that Ms. Young received prior to termination were in retaliation for her protected activity.

90.     During the months of August and September 2017, two articles and one letter to the editor were published in *The Ellsworth American* about MCMH that were written by or quoted current and former MCMH employees.

91.     None of the employees except Ms. Young were disciplined or fired for expressing their opinions.

92.     Ms. Young was treated differently and worse than similarly situated employees.

93.     On August 31, 2017, *The Ellsworth American* published an article quoting two physician providers, one of whom had hospital privileges[3] at MCMH.

94.     On September 7, 2017, *The Ellsworth American* published an article quoting MCMH employees including a registered nurse, a charge nurse in the surgical services department, and the chief Certified Registered Nurse Anesthetist.

---

[3] Hospital privileges are the right of a physician to use the facilities and equipment of a hospital.

95.     On September 14, 2017, *The Ellsworth American* published a letter to the editor written by another physician.

96.     MCMH argued to the MHRC that Ms. Young was not similarly situated to the other employees who were quoted in the newspaper because the others had "arguably" engaged in protected concerted activity within the meaning of Section 7 of the NLRA and the Media Policy did not apply to them.

97.     MCMH told the MHRC that Ms. Young's letter to the editor was "decidedly not" protected concerted activity, which is not true. In her letter to the editor, Ms. Young made common cause with other employees who were voicing concerns over working conditions.

98.     MCMH told the MHRC that Ms. Young had no personal knowledge of the working conditions of doctors and nurses unlike the employees quoted in other newspaper articles, which is not true.

99.     Ms. Young was a Licensed Practical Nurse (LPN) as well as Activities Director.

100.    Ms. Young worked on the Med/Surg unit.

101.    Ms. Young's working conditions were directly affected by inadequate staffing and also by so many doctors leaving.

102.    Ms. Young knew that the locum tenens who filled in were of variable abilities.

103.    Ms. Young knew that some of the locums were let go almost as soon as they arrived and the staff on the Med/Surg unit had to deal with some doctors who were not up to standard.

104.     Ms. Young was consistently attentive and responsive to any assistance the nursing department needed that fit under her scope of practice as an LPN.

105.    A Certified Nursing Assistant ("CNA") told Ms. Young's supervisor that she could not have made it through the day without Ms. Young.

106.    Ms. Young's performance evaluations demonstrate that Ms. Young was directly involved with patient care and that that she had daily experience working with the nurses, aides, and technicians and was knowledgeable about patient safety issues as she was directly involved with incidents where patients' safety was at risk.

107.    Ms. Young's job description allowed her to help with patient care within the scope of her training which at the hospital was CNA level of work. This included answering call lights, helping CNAs with patient care such as bathing patients, toileting, etc.

108.    Ms. Young knew for a fact that the Med/Surg had inadequate staffing because she was involved with patient care and she personally observed that CNAs often had ten or more patients on their assignments.

109.    There were many times that no one was at the nurses' station to take care of business.

110.    For example, on one occasion, Ms. Young intercepted a patient trying to leave the unit without having been discharged. This was one of the concerns that the nurses' petition addressed and was written about in the newspaper. This was one of the unsafe situations that Ms. Young had previously expressed concerns about to her supervisor Mr. Keith via email.

111.    Ms. Young had close working relationships with the doctors who had patients on Med/Surg and ICU.

112.    Ms. Young was responsible for helping patients get needed durable medical equipment before they were discharged home.

14

113.    Ms. Young met with doctors to get signatures on prescriptions and to find out when their patient was expected to be discharged.

114.    Ms. Young's job also involved discussing with doctors what information was needed in their progress and discharge notes as it applied to the needed equipment for insurance purposes.

115.    The December 7, 2017 article about the MCMH tech staff unionizing read, in part:

> "In a news release, the union said employees voted to unionize because of concerns about 'safe staffing, retirement security, adequate equipment and other patient and economic protections'."

116.    The article goes on to quote an employee: "'We joined MSNA so that we can provide the standard of care that our community deserves,' said [Ms. E], medical laboratory technician….."

117.    This demonstrates that many employees felt vulnerable about job security, pay, benefits, etc. and discouraged about management's ability to provide safe patient care.

118.    Ms. Young echoed those concerns in her letter to the editor about management not being responsive to employees' concerns about these matters.

119.    MCMH did not fire employees who were similarly situated to Ms. Young which is proof that Ms. Young was fired due to retaliation.

120.    MCMH did not fire non-disabled employees who were similarly situated to Ms. Young which is proof that Ms. Young was fired due to disability discrimination.

121.    MCMH has a motive to retaliate against Ms. Young because she repeatedly asserted her right to reasonable accommodations and because she complained about disability

discrimination, failure to provide reasonable accommodations, and retaliation over a period of years.

122.   MCMH is also motivated to retaliate because Ms. Young filed a prior complaint with the MHRC and EEOC accusing MCMH of violating her rights under the MHRA, the WPA, and the ADA.

123.   Individual decision-makers who were involved in the decision to fire Ms. Young, including Mr. Lundy and Mr. Keith, had personal reasons to see that she got fired.

124.   **Noah Lundy's animus**: On September 18, 2017, just days before Ms. Young was fired, Mr. Lundy was at the Commission meeting when Ms. Young's prior complaint of disability discrimination and retaliation was discussed and decided.

125.   Mr. Lundy heard Ms. Young tell the MHRC Commissioners that Mr. Lundy had shown no understanding of her disability, had never bothered to read her speech evaluation, and had been irresponsible when she requested alternative work tasks as an accommodation when she was on voice rest.

126.   Mr. Lundy heard Ms. Young publicly accuse him of acting unlawfully when he denied her reasonable accommodations and of providing her with accommodations that were ineffective.

127.   Mr. Lundy heard Ms. Young tell the Commissioners that he was "dismissive" when she asked for volunteers to assist her communicate with patients and of engaging in intentional discrimination against her.

128.   Mr. Lundy previously threatened to terminate Ms. Young for writing to MCMH's Board of Directors to complain about discrimination and retaliation which she had already reported to administrators.

129.    Mr. Lundy told Ms. Young that she was not to make any complaints to anyone other than to him or to her supervisors.

130.    Ms. Young replied by email and told Mr. Lundy that she had already filed complaints with the Joint Commission and with Maine Department of Health and Human Services because of the negligence of the Physical Therapy Clinical Supervisor.

131.    Mr. Lundy should have informed and reassured Ms. Young that she would not be subjected to retaliation for making these complaints but instead he simply refrained from any reply.

132.    **Doug Keith's animus:**  In Ms. Young's 2016 complaint to the MHRC, she accused Mr. Keith of lying and covering up the negligence committed by the Physical Therapy Clinical Supervisor.

133.    Mr. Keith had certainly read Ms. Young's internal complaint in a QSTATIM incident report in which she implicated Keith of this cover-up of the negligence and of failure to abide by the professional standards in MCMH's code of conduct called "True Colors."

134.    Four days later Mr. Keith reprimanded Ms. Young and threatened her with termination.

135.    Ms. Young told the MHRC that Mr. Keith discriminated against her on the basis of disability by approving an unfair performance evaluation and by ignoring the fact that Ms. Young requested and needed additional, effective accommodations in order to fully perform her job duties, such as taking patients to the cafeteria.

136.    Ms. Young also told the MHRC that MCMH treated her differently and worse than other employees by conducting her performance review in the administration building with Mr. Keith present, which was intimidating, and with the CEO lurking in the hallway.

137.    Ms. Young expressed concern in an email to Ms. Formby with a copy to Mr. Lundy and Mr. Keith about Mr. Keith's presence at her evaluations. Ms. Young said she felt it was intimidating and discriminatory as she was the only one who had an evaluation done in the administration building with department head and CEO out in hallway.

138.    All of the persons involved in the termination of Ms. Young were aware of her disability.

139.    All of the persons involved in the termination of Ms. Younger were aware of her previous protected activity.

140.    The termination decision was tainted by the bias of subordinate employees involved in the termination.

141.    The reasons given for the termination are pretexts.

142.    The timing of events including Ms. Young's protected activity and the termination evidence a causal connection between Ms. Young's

143.    The evidence of disparate treatment evidencing a causal connection between Ms. Young's protected activity and termination.

144.    EMHS aided and abetted MCMH in terminating Ms. Young's employment.

145.    EMHS is liable under 5 M.R.S. §4633 because it discriminated against Ms. Young because she opposed an act or practice that is unlawful under this Act and because she made a charge, testified, assisted, participated in an investigation and hearing under the MHRA.

146.    EMHS is liable under 5 M.R.S. §4633 because it coerced, intimated, threatened or interfered with Ms. Young in the exercise and enjoyment of her rights under the MHRA.

147.    Ms. Young was fired because she engaged in protected activity under the MHRA, the ADA, the WPA, and the Rehab Act.

148.    Ms. Young was fired because she made complaints about disability discrimination, retaliation, and whistleblower retaliation to the MHRC and EEOC.

149.    Ms. Young would not have been fired for writing a letter to the editor if she had not engaged in protected activity under the MHRA, WPA, ADA and the Rehab Act and she had not filed complaints with the MHRC and EEOC.

150.    Ms. Young's protected activity under the MHRA, WPA, ADA, and the Rehab Act were motivating factors in the decision to terminate her employment.

151.    Ms. Young was terminated because of her disability and because Defendants regarded her as a person with a disability.

152.    Defendants acted with malice and with deliberate indifference to Ms. Young's state and federal rights.

COUNT I: MHRA

153.    Paragraphs 1-152 are incorporated by reference.

154.    Defendants unlawfully discriminated against Plaintiff because of disability.

155.    Defendants unlawfully retaliated against Plaintiff in violation of the MHRA.

COUNT II: ADA

156.    Paragraphs 1-155 are incorporated by reference.

157.    Defendants unlawfully discriminated against Plaintiff because of disability.

158.    Defendants unlawfully retaliated against Plaintiff in violation of the ADA.

COUNT III: Rehab Act

159.    Paragraphs 1-158 are incorporated by reference.

160.    Defendants unlawfully discriminated against Plaintiff because of disability.

161.    Defendants unlawfully retaliated against Plaintiff in violation of the ADA

COUNT IV: WPA

162.    Paragraphs 1-161 are incorporated by reference.

163.    Defendants' conduct violates the WPA.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendants to be in violation of her rights;

B.    Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.    Order Defendants to reinstate Plaintiff;

D.    Order Defendants to award front pay to Plaintiff;

E.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

F.    Award equitable-relief for back pay, benefits and prejudgment interest;

G.    Award compensatory damages in an amount to be determined at trial;

H.    Award punitive damages in an amount to be determined at trial;

I.    Award liquidated damages in an amount to be determined at trial;

J.    Award nominal damages;

K.    Award attorney's fees, including legal expenses, and costs;

L.    Award prejudgment interest;

M.    Permanently enjoin Defendants from engaging in any retaliatory employment;

N.    Require Noah Lundy to mail a letter to all employees notifying them of the verdict against Defendants and stating that Defendants will not tolerate retaliation in the future;

O.    Require that Defendants post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

P.      Require that Defendants train all management level employees on the protections afforded by the MHRA, ADA, WPA and Rehab Act;

Q.      Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants terminated her due to unlawful retaliation; and

R.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  May 7, 2019                         /s/ Chad T. Hansen
                                            Chad T. Hansen
                                            Attorney for the Plaintiff

                                            MAINE EMPLOYEE RIGHTS GROUP
                                            92 Exchange Street 2nd floor
                                            Portland, Maine 04101
                                            Tel. (207) 874-0905
                                            Fax (207) 874-0343
                                            chansen@maineemployeerights.com